**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**TIMOTHY S. RYAN,**

      **Plaintiff,**

v.                            **Civil Action No.  5:09CV55**
                                  **(The Honorable Frederick P. Stamp)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and have been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

### I.  PROCEDURAL HISTORY

Timothy Ryan ("Plaintiff") filed an application for DIB on April 21, 2005, alleging disability due to low back pain, artery problems and depression since September 1, 2004 (R. 47-51, 56, 344). Plaintiff's applications were denied at the initial and reconsideration levels (R. 37, 38).  Plaintiff requested a hearing, which Administrative Law Judge George Mills, III, ("ALJ") held on May 8, 2007 (R. 337).  Plaintiff, represented by counsel, Anthony Rogers,  testified on his own behalf (R.343-75).  Also testifying was Vocational Expert James Ganoe ("VE") (R. 375-82 ).  On September 12, 2007,  the ALJ entered a decision finding Plaintiff retained the residual functional

capacity to perform modified light work (R.19-29). Plaintiff timely filed a request for review to the Appeals Council (R. 14-15). On March 27, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-10).

## II. FACTS

Plaintiff was born on February 2, 1965, and was forty-two years old at the time of the administrative hearing (R. 343). He has a high school education and past relevant work as a security guard and sales person (R. 345, 80).

Dr. Allan H. Macht corresponded with Bruce E. Ingerman, Esquire, on April 11, 2003 about Plaintiff's back injury. Plaintiff reported that his back ached in cold weather; it hurt to bend and turn; he could not lift heavy objects; he could not bowl, jog, ride a bicycle, participate in any sport activities, or play in a rough manner with his children; he could not sit, walk, stand or drive as often as "he could before"; and he had numbness in his right leg (R. 133).

Dr. Macht's examination of Plaintiff revealed Plaintiff was 5'4" tall and weighed 160 pounds. Plaintiff had tenderness upon palpation in his lower back; twenty-seven degrees of lower back flexion; eight degrees of extension; and lateral bending to fifteen degrees. Plaintiff had pain with back motion. His sensation in his lower back was intact; his deep tendon reflexes were physiological; his heel and toe walking were in tact; he had no atrophy. Dr. Macht noted Plaintiff's x-rays of his lumbar spine and pelvis showed no bony abnormalities (R. 133).

Dr. Macht noted the following: 1) an August 2002 MRI scan of Plaintiff's back showed "a small posterior disc bulging protrusion about L4-L5 with a tiny posterior annular tear"; 2) a "small diffuse posterior disc protrusion at L5-S1 with evidence of his previous surgery and epidural scarring"; and a "7mm density projecting immediately adjacent to the medial aspect of the left S1

nerve root suspicious for a small disc fragment" (R. 133-34). He noted Plaintiff's myelogram and CAT scan "showed scar tissue about L5-S1 on the right with a possible small disc herniation." Dr. Macht opined Plaintiff's permanent partial impairment was seventy percent (R. 134).

On September 2, 2003, Carlos S. Santiago, III, M.D., evaluated Plaintiff for complaints of "low back pain with right sided radiculopathy all the way down to the foot." Plaintiff reported he had had three epidural steroid injections in May, 2003. Plaintiff reported no psychiatric or psychological "interventions"; he smoked one-and-one-half packages of cigarettes per day and drank one case of beer per weekend. Dr. Santiago noted Plaintiff's August 30, 2003, MRI showed a "small diffuse posterior disc bulge protrusion with a tiny posterior angular tear" at L4-L5 and a "small diffuse posterior disc protrusion" at L5-S1. Plaintiff's S1 nerve root appeared to be "symmetrically swollen" (R. 196). The MRI showed a "7mm density projecting immediately adjacent to the medial aspect of the left S1 nerve which [was] suspicious for small disc fragment." Dr. Santiago opined the density was "new in comparison to the prior exam." Dr. Santiago diagnosed "chronic back pain with right sided radiculopathy." He prescribed pain medication and a "narcotic contract" (R. 197).

On September 18, 2003, Plaintiff underwent a nuclear stress test. It showed "normal persantine stress test without clinical, electro cardiographic or nuclear scintigraphic evidence of reversible myocardial ischema." The report read "there [was] a low probability of hemodynamically significant fixed obstructive coronary disease at the present time" (R. 135-36).

On January 14 and 28, and February 11, 2004, Plaintiff received caudal epidural injections from Dr. Santiago (R. 192-4).

On April 26, 2004, Plaintiff presented to Dr Vikramadity A. Poonai with low back pain. He was prescribed Flexeril (R. 150-51).

On May 4, 2004, Plaintiff underwent a bilateral lower extremity arteriogram. John N. Pappas, M.D., the physician who administered the test, found "[m]ild stenosis in the left common iliac artery and left common femoral artery without evidence of significant pressure gradient to warrant intervention. Two-vessel runoff to the left foot, which demonstrate[d] slow flow. Single vessel runoff to the right foot, as above" (R. 210-11).

On June 7, 2004, Plaintiff reported to D. Santiago that he continued to work as a salesman, which required driving. Plaintiff had reduced pain and had been "weed wacking" (R. 188).

On July 6, 2004, Plaintiff requested that Dr. Santiago provide a prescription for Percocet "one day early." He sated his was talking three Percocet per day and his pain level was five (R. 187).

On August 23, 2004, Plaintiff reported to Dr. Santiago that he continued "to work [on] oil delivery truck." He medicated with Percocet; his pain level was five. Dr. Santiago refused to provide Plaintiff an "early" prescription for Percocet (R. 186).

On September 7, 2004, a MRI, without IV contrast, was made of Plaintiff's lumbar spine. It showed degenerative and postoperative statuses at L4-5 and L5-S1 were unchanged from the prior study (R. 170). Additionally, the MRI showed a "normal examination of the orbits without evidence of a metallic foreign body" (R. 171).

On September 13, 2004, Plaintiff was examined for low back pain by Dr. Poonai. He ordered a MRI. Plaintiff reported stooping, climbing stairs, and/or bending caused significant pain in his low back and into his right leg (R146-47).

Plaintiff was examined by Dr. Poonai on October 11, 2004, for low back pain. Dr. Poonai noted Plaintiff was to participate in physical therapy for one-to-three weeks (R. 144-45).

On October 11, 2004, Plaintiff presented to Dr. Santiago for pain medications. He informed

Dr. Santiago that he had "switched job to a security company" and quit it. He stated he was "looking for another line of work that [did not] require heavy lifting" (R. 185).

Plaintiff began physical therapy on October 15, 2004, for right lumbar radiculopathy. Physical Therapist John Staggers' objective findings were that Plaintiff ambulated with a mild antalgic limp in his right leg. Plaintiff's standing range of motion was thirty-five degrees flexion and fifteen degrees extension with low back pain. Plaintiff had sixty degree rotations with no pain. His bending was at forty degrees for both sides, with low back pain. Plaintiff's supine straight leg raising test was negative on the left and positive on the right at thirty-five degrees. Plaintiff had decreased weight bearing on his right leg. Plaintiff's back was tender to palpation "at the mid line" of the cervical spine and was positive for lumbar paraspinal muscle spasm (R. 139).

Dr. Poonai examined Plaintiff for low back pain on November 30, 2004. He noted that Plaintiff had been referred to physical therapy "but did not last" (R. 142-43).

Upon referral from Dr. Poonai, Sarim R. Mir, M.D., conducted a neurological consultation, lower extremity nerve conduction study and EMG of Plaintiff on December 13, 2004. Plaintiff informed Dr. Mir that he injured his back on August 25, 2004, at work and had not worked since that date. Plaintiff reported "discomfort and paresthesias in the right lower extremity"(R. 152).

Dr. Mir's physical examination of Plaintiff revealed "mild distress" due to back pain. Plaintiff's deep tendon jerks were "+2 at the knees and +1 at the ankles." He could walk on his heels and toes. His straight leg raising test was positive on the right at sixty degrees. Dr. Mir found no "definite or reproducible sensory deficit." Plaintiff's plantars were bilaterally downgoing (R. 153).

The motor and sensory nerve conduction studies were performed by Dr. Mir showed "no electro physiological evidence of a lumbar radiculopathy." The nerve conduction studies were

"within normal limits." Needle examination showed no "fibrillation potentials or positive sharp waves." Dr. Mir found Plaintiff had "symptoms suggestive of a right lumbar radiculopathy, but there [was] no electro physiological evidence of an acute radiculopathy" (R. 153).

Dr. Mir noted he agreed with Dr. Poonai's "plan of continuing" Plaintiff "on physical therapy." Dr. Mir found Plaintiff should take Percocet "sparingly." Dr. Mir referred Plaintiff to Dr. Dey for an evaluation for treatment with "interventional pain procedures" (R. 153).

On November 15, 2004, Plaintiff requested an early refill of Percocet from Dr. Santiago; this request was denied. Plaintiff took three Percocet per day and depleted his prescription ten days early (R. 184).

On December 14, 2004, Plaintiff requested that Dr. Santiago refill his pain medication "early." Dr. Santiago did not. Plaintiff's pain level was five; his ADLs included driving, grocery shopping, and "handyman." Plaintiff reported he was participating in physical therapy three times per week (R. 183).

On January 10, 2005, Plaintiff was evaluated by Mark G. Nelson for possible lower extremity claudication. Dr. Nelson corresponded with Dr. Poonai that Plaintiff's low back symptoms were "somewhat suggestive of a neurologic injury rather than vascular problem." Dr. Nelson "encouraged" Plaintiff to cease smoking and to "exercise as much as possible once the neurologic etiology has been ruled out" (R. 154).

Plaintiff presented to Dr. Dey on January 13, 2005, with low back pain. Plaintiff reported his pain was located in the left lumbar region, was worse in the morning, and got "a little bit better when he move[d] around." Plaintiff stated he experienced "radiation to the posterior part of the right thigh only, however on occasion he [did] get sharp shooting pains all the way down his right leg."

Plaintiff had no weakness or numbness. Plaintiff reported he had received three epidural injections in 2004 and he realized "no effect" from them. Plaintiff stated he medicated with Percocet, which "help[ed] some" (R. 267). Plaintiff reported no shortness of breath, chest pain or cough. His blood pressure, heart rate, and respirations were normal. Plaintiff's attention, concentration, and cranial nerves were normal. Plaintiff's motor examination was normal. Plaintiff had full strength proximally and distally in his arms and legs (R. 267). Plaintiff could heel and toe walk and stand on either leg. His reflexes were symmetric. His toe responses were "flexor." Dr. Dey noted a "mild sensory deficit in the right S1 distribution." Plaintiff's straight leg raising test produced low back pain, but no radicular pain (R. 268).

Dr. Dey opined that "most likely pain generators [were] the lumbar facet joints." He noted Plaintiff had "superimposed muscle spasms," which could be palpated and a "significant part of his pain problem." Dr. Dey observed that Plaintiff's "description of pain shooting down his leg [was] suggestive of radicular pain, however this type of pain [did] not bother him as much as the low back pain." Dr. Dey's plan of treatment for Plaintiff's pain, which was "arthritic in nature," was for lumbar botox treatments and Motrin 400-800 (R. 268).

On January 25, 2005, Plaintiff reported to Dr. Santiago that he had more pain and had been taking more Percocet. Plaintiff rated his pain at seven (R. 182).

On February 16, 2005, Dr. Poonai found Plaintiff's examination of his systems to be normal. He noted Plaintiff "need[ed] more" physical therapy, which he prescribed (R. 337-38).

On February 17, 2005, Plaintiff underwent a segmental arterial Doppler examination of his lower extremities. It showed "no evidence of significant occlusive disease . . . at the right and left iliac, femoral, or popliteal arteries." The "right and left ankle brachial indices [were] within normal

limits, showing no evidence of arterial insufficiency of the lower legs . . ." (R. 155).

On February 21, 2005, Plaintiff reported to Dr. Santiago that he treated his pain with three Percocet per day; he vacuumed; and his pain level was at six (R. 181).

On March 17, 2005, Dr. Macht corresponded with Steven Siegel, Plaintiff's lawyer. Dr. Macht reported Plaintiff had "been back to his doctor for injections" and that he had "received more injections." Dr. Macht reported Plaintiff complained of "severe pain and pinching constantly about the back region." Plaintiff stated "it hurt[] to bend and turn his back" and that cold and damp weather cause his back to hurt. Plaintiff stated he could not swim, do laundry, ride a bicycle, lift heavy objects, operate a "weed whacker," mow the lawn, bowl, or jog due to back pain. He could not "sit, walk, stand or drive as much as before." Plaintiff reported difficulty sleeping and using stairs. He stated he "stopped playing rough with children and doing sports activity." He stated he experienced numbness and pain in " his right leg to the ankle and occasionally about the left leg." Plaintiff reported his "back [was] getting worse" and he experienced pain more frequently (R. 173).

Dr. Macht's examination of Plaintiff revealed tenderness upon palpation in his lower back; twenty degrees of lower back flexion; nine degrees of extension; and lateral bending to ten degrees. Plaintiff had pain with back motion. His sensation in his lower back was intact; his deep tendon reflexes were physiological; his heel and toe walking were in tact; he had no atrophy. Plaintiff's straight leg raising test was positive at ten degrees; his hip flexion was limited to three degrees; his hip extension was limited to three degrees (R. 173). Based on Plaintiff's stated limitations and the results of Dr. Macht's examination of him, Dr. Macht found Plaintiff's permanent partial impairment was eighty percent (R. 174).

On March 21, 2005, Plaintiff presented to Dr. Santiago. He stated his pain level was five;

he performed "mostly house chores"; he was sedentary; and he drove a car, but not at night (R. 180).

On March 23, 2005, Physical Therapist Malesiewski provided a written report to Dr. Poonai. Plaintiff reported that he had recently vacuumed and done laundry, which made him a "little sore." Plaintiff stated his pain level was "5/10." P. T. Malesiewski noted Plaintiff had "done reasonably well so far." Plaintiff showed "good improvement in his range of motions, especially with the straight leg motion on the right." Plaintiff was "not back to his normal functioning activity level," which was "one of [their] goals" (R. 177).

Thomas B. Haywood, M.D., a cardiologist, evaluated Plaintiff on April 5, 2005, for chest pain. Plaintiff complained of fatigue and "episodes of anterior precordial chest pain." Dr. Haywood noted Plaintiff had a "history of PVD and ha[d] undergone stenting." Dr. Haywood's exam of Plaintiff was normal (R. 204). Dr. Haywood diagnosed chest pain and ordered a pharmacologic stress test (R. 205).

On April 22, 2005, Plaintiff underwent a nuclear stress test, which was abnormal for the "LV is at the upper limit of normal in size with a mildly depressed ejection fraction of 47% associated with an exercise induced wall motion abnormality involving the distal anterior wall in the apex. While a perfusion defect is not clearly apparent, this is abnormal and cardiac catheterization should be considered for further evaluation" (R. 200-01, 319-20).

On April 25, 2005, Physical Therapist Scott Malesiewski provided a written report to Dr. Poonai. Plaintiff reported to P.T. Malesiewski that he had "aggravated his back the middle of last week while trying to unload some wood from a truck" and that the aquatic therapy he received the next day "really helped him reduce his pain level." P.T. Malesiewski noted that Plaintiff's pain was "4 to 5/10 at rest but . . . 8/10 with manual muscle testing of his trunk flexors." P.T. Malesiewski

found that Plaintiff "continued to show some improvement in his range of motion including straight let raise . . . which show[ed] that there [was] less irritation of the sciatic nerve." Plaintiff continued to have "some difficulty with his trunk strength and just testing it caused some discomfort" and that he "need[ed] to continue to work in that area" (R. 175-76).

On April 26, 2005, Plaintiff was examined by Dr. Santiago. He noted Plaintiff's ADLs were "mostly sedentary." Plaintiff stated he treated his pain with five Percocet tablets per day, which did not alleviate his pain. His pain scale was five. Dr. Santiago prescribed Percocet (R. 179).

On April 27, 2005, Dr. Poonai found his examination of Plaintiff's systems normal. Dr. Poonai noted Plaintiff could not lift easily and experienced pain with extended standing (R. 233-34).

On May 5, 2005, Plaintiff presented to Dr. Haywood, for follow up to his April 22, 2005, stress test. Dr. Haywood's examination revealed normal range of motion, normal carotid uptakes, no bruits, clear lungs, normal heart sounds, no murmurs, normal cranial nerves, symmetric motor strength, and intact sensation. Plaintiff's judgment and insight were appropriate; he was oriented as to place and time; his recent and remote memories were intact; and his mood and affect were normal. Dr. Haywood's assessment was for suspected coronary artery disease and he recommended cardiac catheterization (R.198).

Plaintiff's May 17, 2005, chest x-ray for Plaintiff's chest pain, was normal. Plaintiff's lungs were clear and his mediastinal structures and pleural spaces were normal (R. 209).

Plaintiff 's May 24, 2005, cardiac catheterization showed "normal coronary anatomy with no identifiable obstructive coronary artery disease," "[h]ypokinesis of the left ventricular apex of uncertain etiology" and normal global left ventricular systolic function  (R. 206-07).

On May 31, 2005, Dr. Poonai examined Plaintiff; the examination of his systems was

normal. Plaintiff stated experienced increased back pain "while play[ing] horseshoes" (R. 231-32).

On July 6, 2005, Dr. Poonai examined Plaintiff. His HEENT, heart, lungs, abdomen, extremities, neuro and skin were normal. Dr. Poonai diagnosed low back pain. Plaintiff stated that he experienced "significant" pain with pushing and standing for long periods of time but that he hoped to return to work "next month" (R. 229-30).

Plaintiff had no specific complaints when he visited Dr. Santiago on July 12, 2005. He requested a refill on his pain medication because he was going on vacation. Dr. Santiago did not refill the prescription early (R. 288).

On August 3, 2005, Plaintiff's physical examination by Dr. Poonai was normal R. 227-28).

On August 9, 2005, Plaintiff presented to Dr. Dey for a follow up examination. Dr. Dey noted the botulinum toxin injection for Plaintiff was denied. Plaintiff stated he experienced pain in his low back, which radiated towards the top of his right thigh. His symptoms were worse when he stood for long periods of time. Plaintiff informed Dr. Dey that he had spinal surgery in 1996, during which he though two discs were removed. Plaintiff stated he medicated with Percocet, smoked one package of cigarettes per day and had not drunk alcohol since the birth of his son (R. 265).

Plaintiff had no dizziness, drowsiness, or fatigue. Plaintiff heart rate and blood pressure were normal. Plaintiff' motor, concentration, attention, and cranial nerve examinations were normal. Plaintiff had "full strength proximally and distally in the arms and legs bilaterally." His toe responses were flexor. There was a "mild sensory deficit in the right S1 distribution"; his straight leg raising test produced low back pain, "but no radicular pain"(R. 265).

Dr. Dey's impression was for: 1) "pain from the right L4-5 facet joint and possibly residual right L5-S1 facet joint, where he had the hemi fasciectomy, with superimposed muscle spasms" and

2) "chronic opioid therapy by Dr. Santiago," which Plaintiff wanted Dr. Dey to take over. Dr. Dey's plan for Plaintiff was to "take over his opioid medications" and "start him on methadone 2.5 mg t.i.d." and to continue his Percocet prescription until "the medication kicks in." Dr. Dey prescribed "right lumbar facet blocks of the L4-5, probably L5-S1 and L3-4 facet joints" (R. 266).

Plaintiff presented to Dr. Santiago on August 23, 2005, with a pain level at "4-5." Plaintiff's overall quality of life was "good." Dr. Santiago made no changes to his prescriptions (R.287).

On August 26, 2005, Cynthia Osborne, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 217-24). Dr. Osborne found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour work day; sit but must periodically alternate sitting and standing to relieve pain or discomfort, and unlimited push and/or pull (R. 218). Plaintiff could never climb ladders, ropes, or scaffolds and could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and/or crawl (R. 219). Dr. Osborne found Plaintiff had no manipulative, visual or communicative limitations (R. 220-21). Dr. Osborne opined that Plaintiff should avoid concentrated exposure to extreme cold, humidity, noise, and vibration. Plaintiff's exposure to extreme heat, wetness, and hazards was determined to be unlimited (R. 221). Dr. Osborne determined Plaintiff's RFC was "limited light" and that Plaintiff was credible (R.223-24).

On September 20, 2005, Plaintiff reported "no problems" to Dr. Santiago. He stated he "had pretty much adjusted to his disability. He "currently ha[d] a new job" (R. 286).

On September 26, 2005, Dr. Poonai's examination of Plaintiff revealed normal results in his HEENT, heart, lungs, abdomen, extremities, neurological, and skin. Plaintiff continued to smoke. Dr. Poonai diagnosed low back pain (R. 225-26).

Beginning September 27, 2005, Plaintiff wore a Holter monitor to evaluate his heart activity. The results were that Plaintiff had normal sinus rhythm; no significant atrial or ventricular arrhythmias; "no periods of AV block were present"; or no significant segment shifts. It was noted that Plaintiff "had complaints of heart beating hard, which [did] not correlate with any rate or rhythm disturbances" (R 157).

On October 25, 2005, Plaintiff reported no side effects from his pain medication to Dr. Santiago. He stated he participated in "mostly sedentary activity" and that he drove "rarely." Plaintiff's pain level was five; his attention and orientation were sharp (R. 285).

On December 29, 2005, Dr. Santiago completed a Low Back Residual Functional Capacity Questionnaire of Plaintiff (R. 241). His diagnosis was chronic back pain with right sided radiculopathy. Dr. Santiago based his findings on a lumbar myelogram and CT scan, which showed "soft tissue density L5-S1" which "could represent scarring from previous surgery . . . ." Dr. Santiago characterized Plaintiff's low back pain as existing twenty-four hours per day, with the pain being a "10 at worse & 7 at best" and that Plaintiff's pain interrupted his sleep (R. 241). Dr. Santiago opined Plaintiff's impairment lasted or could be expected to last at least twelve months and that his impairment was consistent with his symptoms. Dr. Santiago found Plaintiff's symptoms "seldom" interfered with Plaintiff's attention and concentration and that the medication he took to treat the pain caused drowsiness and dizziness (R. 242).

Dr. Santiago opined Plaintiff could sit continuously for two hours and stand continuously for forty-five minutes. Plaintiff, according to Dr. Santiago, could stand/walk for less than two hours in an eight-hour workday and sit about two hours in an eight-hour workday (R. 242). Plaintiff needed to walk for three minutes, every sixty minutes during an eight-hour workday (R. 242-43).

Dr. Santiago opined Plaintiff needed to take unscheduled breaks every two hours and rest for five-to-ten minutes before returning to work. Dr. Santiago did not offer an opinion as to whether Plaintiff needed to shift positions at will from sitting to standing or walking. Plaintiff did not need to have his legs elevated during prolonged sitting. Dr. Santiago found Plaintiff did not need to use a cane while standing or walking. Plaintiff could never lift and/or carry fifty pounds, occasionally lift/carry twenty pounds, and frequently lift/carry ten pounds or less. Plaintiff's ability to repetitively reach, handle or finger was not limited (R. 243). Dr. Santiago offered no opinion as to how frequently Plaintiff could bend or twist at the waist. He found Plaintiff's condition would cause him to have good and bad days and that he would have to be absent from work about twice per month due to his impairment and/or treatment. Dr. Santiago indicated Plaintiff was not a malingerer and that Plaintiff would function at this level for more than one year (R. 244).

On January 10, 2006, Dr. Santiago noted Plaintiff had no "problems presented." He had "no lethargy, no drowsiness." Plaintiff's pain was controlled, "allowing him to have a better quality of life" (R. 283).

On February 8, 2006, Plaintiff was evaluated by Dr. Santiago. His pain was listed at four; his attention and orientation were noted as "sharp." Plaintiff's pain was "well controlled." Plaintiff reported he was no longer working and "mostly sedentary." Dr. Santiago noted Plaintiff was doing "reasonably well" (R. 282).

On February 25, 2006, Susan L. Garner, M.D., completed an Internal Medicine Examination of Plaintiff. Plaintiff's chief complaints were "back problems, vascular disease and skin cancer." A MRI showed a ruptured disk at L4-L5 and underwent a laminectomy. Subsequent to this injury, he "ruptured S1 and tore loose scar tissue" in his low back. He participated in physical therapy for

nine months after this injury, but "it did not relieve the problem." Plaintiff also received treatment with a pain management specialist but received no relief from his pain. Plaintiff described his low back pain as "cramping and constant." It radiated to his right leg. He experienced numbness, tingling, and weakness of the right leg. Plaintiff stated that bending and sitting caused pain (R. 247).

Plaintiff reported he was diagnosed with peripheral vascular disease in 2003. Plaintiff stated his left foot became "discolored and pale" and he was diagnosed with occlusion of both femoral arteries. He underwent an aorta bi-femoral bypass grafting and received a stent. He reported that he began having "problems with pallor in the feet again with the left being worse than the right; however, he was not experiencing much pain. Plaintiff reported his January, 2006 Doppler examination revealed re-occlusion of his bypass graft (R. 248).

Plaintiff informed Dr. Garner that he had been diagnosed with skin cancer on two locations on his scalp, was being evaluated by Dr. McCain, a dermatologist, and had undergone cryotherapy for treatment of one of the skin cancers (R. 248). Plaintiff reported he had hyperlipidemia, smoked one package of cigarettes per day, and occasionally used alcohol. Plaintiff stated he medicated with Endocet, Avinza, aspirin, Vytorin, and penicillin (R. 248). Plaintiff denied pulmonary, cardiovascular, gastrointestinal, genitourinary, or neurological impairments (R. 248-49).

Dr. Garner reviewed Dr. Kim's interpretation of Plaintiff's February 17, 2005, arterial Doppler examination, which indicated a "history of blood clots and the impression is no evidence of significant occlusive disease . . . at the right or the left iliac femoral or popliteal arteries." Dr. Garner also noted it showed "right and left ankle brachial indices were within normal limits showing no evidence of arterial insufficiency" (R. 249).

Dr. Garner's physical examination of Plaintiff showed his gait was normal and he used no

ambulatory aids or assistive devices. He had no difficulty rising from a seated position or climbing up on or down from the examination table. Plaintiff appeared comfortable while seated; he had back pain while lying supine (R. 249). Dr. Garner's examination of Plaintiff's HEENT, neck, chest, cardiovascular, abdomen, extremities, cervical spine, arms, hands, knees, ankles, and feet were normal (R. 249-50). Dr. Garner found Plaintiff had "no obvious skin pallor" of his feet. He had "easily palpable dorsalis pedis and posterior tibial pulses." He experienced no pain with ambulation; no femoral bruits were noted (R. 251). Dr. Garner observed that Plaintiff had one lesion on his scalp that had been treated and it "had regressed"; the other lesion was "barely palpable" and appeared to be an actinic keratosis (R. 252). Dr. Garner found Plaintiff's vital signs, sensation, and deep tendon reflexes were normal. Plaintiff's neurologic examination was normal. He could heel walk, toe walk and heel-to-toe walk; he could squat without difficulty (R. 249-51).

Plaintiff's lumbosacral spine/hips examination revealed "tenderness over the spinous processes but no paravertebral muscle spasm." Plaintiff had "restricted range of motion in forward flexion and could not perform that past 30 degrees." Plaintiff could laterally flex without difficulty; he had a positive straight leg raise test at thirty degrees on the right and sixty degrees on the left, with back pain. Plaintiff could stand on one leg at a time. Dr. Garner found no tenderness on palpation of Plaintiff's hips; he could flex and extend his hips without difficulty (R. 250).

Dr. Garner's impression was for chronic lumbar pain, "likely degenerative disk disease"; peripheral vascular disease; and "actinic keratosis versus squamous cell carcinoma" (R. 251).

On March 8, 2006, Atiya M. Lateef, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 255-62). Dr. Lateef found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of

at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and unlimited push/pull (R. 256). Dr. Lateef found Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl (R. 257). Dr. Lateef found Plaintiff had no manipulative, visual or communicative limitations (R. 258-59). Dr. Lateef opined Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid all exposure to hazards. Plaintiff's exposure to wetness, humidity and noise was unlimited (R. 259).

On March 22, 2006, Plaintiff reported to Dr. Santiago that his pain was elevated to seven due to increased "activity, driving, light housework, and grocery shopping." Plaintiff reported he had gone deer hunting two times during the winter. His attention and orientation were listed as "sharp." His overall quality of life was noted as "good" (R. 281).

Plaintiff's pain level was "five" when he presented to Dr. Santiago on April 19, 2006. Plaintiff stated he had "trouble cleaning house." His overall quality of life was "good"; he reported no side effects to his pain medication (R. 280).

Plaintiff underwent a bilateral lower extremity arterial ultrasound with peripheral vascular treadmill testing on April 21, 2006. It showed "[n]ormal brachial indices at rest . . ."; "[m]inimal right-sided infrapopliteal atherosclerotic disease with a slightly dampened dorsalis pedis pressure"; and "[n]ormal physiologic response to exercise with increase in the ankle pressure one minute after cessation of exercise." It was determined that the "numbness and tingling that the patient experienced in the feet [were] likely not vascular related" (R. 311-12).

On May 18, 2006, Plaintiff returned to Dr. Poonai for low back pain. Plaintiff's HEENT, heart, lungs, abdomen, extremities, neuro, and skin examinations were normal (R. 273).

On June 14, 2006, Dr. Santiago made no changes to Plaintiff's medications and noted his overall quality of life was "good." Plaintiff stated that weather "influenced" his pain levels (R. 279).

On June 23, 2006, Dr. Mir evaluated Plaintiff for paresthesias in his hand and discomfort in his wrist. He conducted an EMG study. Plaintiff stated he experienced pain that started at his wrist and went down to his hands. Plaintiff experienced numbness in his hands, "mainly when he [had] to perform tasks that require[d] manual dexterity." Plaintiff had no neck pain, chest pain, shortness of breath, cough or expectoration. Dr. Mir's examination of Plaintiff revealed he was in "no acute distress"; had no facial weakness; had supple neck; had equal hand grips; had no dysmetria; had no "definite or reproducible weakness"; had no atrophy; had positive Tinel's sign in right wrist; had no cervical paraspinal tenderness; had normal station; and had normal gait. Plaintiff had "decreased sensation in digits one and two of the right hand" (R. 263).

The motor and sensory nerve conduction studies of Plaintiff's upper extremities showed "mild prolongation of the median palmar nerve action potential latencies." The rest of the nerve conduction study, which included testing of the median, ulnar, and radial nerves, was normal. The needle examination of Plaintiff's upper extremity muscles showed no "fibrillation potentials" or "positive sharp." Dr. Mir opined there was "electro physiological evidence of mild bilateral carpal tunnel syndrome" and advised Plaintiff to wear a "cockup wrist splint on both hands at night," take vitamin B6, and do hand-stretching exercises (R. 264).

On August 23, 2006, Plaintiff presented to Dr. Santiago with a pain level of seven. Plaintiff's ADLs were unchanged from his earlier evaluation with Dr. Santiago. His overall quality of life was "good" (R. 278). He was positive for morphine, Oxycodone, and Tramadol (R. 269).

On September 21, 2006, Plaintiff presented to Dr. Poonai with low back pain. Dr. Poonai

refused to refill Plaintiff's medication. Plaintiff's HEENT, heart, lungs, abdomen, extremities, neuro and skin were normal (R. 271). Dr. Poonai noted Plaintiff pain was "better today," but that Plaintiff could not "lift, push, stand, walk for long periods of time" (R. 272).

On September 27, 2006, a CT was made of Plaintiff's lumbar spine. It showed "large right anterior extradural mass effect . . . at L5-S1 representing postsurgical scar vs. recurrent disc herniation." The "[r]emainder of . . ." Plaintiff's "lumbar intervertebral discs and lumbar neural canal [were] entirely within normal limits" (R. 316).

On October 17, 2006, Dr. Santiago noted Plaintiff was experiencing no side effects from his prescription medication. Plaintiff's complaint was for chronic low back pain with right sided radiculopathy. Plaintiff stated his pain was persistent and aggravated by weather (R. 277).

On November 22, 2006, Dr. Santiago noted Plaintiff continued to take his medication; he needed his prescription refilled; and he was suffering no side effects from the medication. Plaintiff's pain was listed as "chronic residual"; Dr. Santiago made no changes in the treatment plan (R. 276).

On December 11, 2006, Plaintiff's heart was monitored for twenty-four hours. The results showed normal sinus rhythm, no significant atrial or ventricular arrhythmias, no AV blocks, and no "ST segment shifts" (R. 300).

A duplex venous Doppler examination of Plaintiff's right lower extremity was conducted on February 22, 2007. It showed "entirely normal appearing right common femoral vein"; "right superficial femoral and right popliteal veins [were] entirely within normal limits"; "no evidence of deep vein thrombophlebitis"; "incompetent anterior branch of the right greater saphenous vein [was] seen with superficial venous reflux"; and "no evidence of significant varicosities" (R. 297).

On March 20, 2007, Kheder Ashker, M.D., conducted a consultative examination of Plaintiff

upon referral from Dr. Poonai. Dr. Ashker noted Plaintiff had cancelled the appointment three times. Plaintiff informed Dr. Ashker that he experienced right leg pain, which has "been going on for over four to five years." Dr. Ashker noted Plaintiff's March, 2007, CT scan had not changed "much" from the October, 2006, CT scan of his lumbar spine. It showed "a soft tissue mass in the right at the L5-S1 level," which "could be due to scar tissue or possible disc herniation." Dr. Ashker noted Plaintiff had medicated with 90mg daily of "morphine for several years" and with one or two Percocet tablets daily. Plaintiff stated he had "been doing okay with that [medication dosages] but he just want[ed] to see if there is any alternative to taking this pain medication." Plaintiff reported he had not worked since August, 2004; he had high cholesterol, for which he took Lexapro; he smoked a package of cigarettes a day; and he drank on the weekends (R. 317, 323).

Plaintiff's complaints were for "occasional chest pain, arm pain, leg pain, numbness, back pain, and left leg pain more than the right." Upon examination, Plaintiff was "alert, awake, and coherent." He was able to "get up and walk on toes and heels and get up from the squat position without much difficulty." Plaintiff's back range of motion was "without much limitation." Plaintiff was "able to flex to about $30°$ and extend $20°$." His straight leg raising on the right was positive at forty-five degrees, with sciatica, and ninety degrees on the left, with "mainly back pain." Plaintiff's motor examination was unremarkable; his sensation was decreased "in the lateral aspect of the right foot" (R. 317, 323).

Dr. Ashker's impression was for "[r]ecurrent disc herniation as well as scar tissue right L5-S1 level" and "[p]rolonged disability and prolonged narcotic use." Dr. Ashker recommended a MRI of the lumbar spine to determine "how much of the mass lesion [was] scar tissue and how much [was] . . . disc herniation." Dr. Ashker opined that "after he has been on narcotics for over three

years no matter what we do he most likely will demand the narcotics." Dr. Ashker noted he would reevaluate Plaintiff after the MRI (R. 317, 323).

On March 28, 2007, Dr. Ashker evaluated Plaintiff after he completed the MRI, which showed, in Dr. Ashker's opinion, "mainly scar tissue." There was "only mild disc protrusion" and "no disc herniation . . . . to warrant any surgical intervention." Dr. Ashker observed that the "nerve root seemed to be visible nicely even after his surgery . . . ." Dr. Ashker did not recommend surgery to Plaintiff (R. 318, 324).

Dr. Ashker's examination of Plaintiff showed positive straight leg raising on the right at forty-five degrees and negative on the left, at ninety degrees. Plaintiff walked with a limp; he had "decreased sensation in the lateral aspect of the right foot." There was no weakness. Plaintiff could walk on his toes and heels and get up form the squat position without any difficulty (R. 318, 324).

On May 1, 2007, Dr. Poonai completed a Medical Assessment of Physical Ability to do Work Related Activities. Dr. Poonai noted he did "not do formal work assessments in [his] office – these are last estimates requested by Kirkwood Roger . . ." (R. 321).

Dr. Poonai found Plaintiff could lift and carry a maximum of ten pounds at a time; frequently lift and carry ten pounds; stand on his feet for one hour at one time; stand and walk for a total of one hours in an eight-hour workday; sit for one hour at a time; and sit for a total of one hour in an eight-hour workday. Dr. Poonai offered no opinion as to Plaintiff's need to alternate between sitting and standing during the workday or resting in an eight hour time period. Dr. Poonai found Plaintiff had no hand limitations. Dr. Poonai noted Plaintiff could not push and pull leg and foot controls "well" due to "worsening back pain." Dr. Poonai noted Plaintiff was never able to crawl, could occasionally bend and could frequently reach. He did not offer an opinion as to what functions

Plaintiff could continuously perform (R. 321). Plaintiff was found to be moderately limited in his exposure to unprotected heights. Dr. Poonai noted he believed Plaintiff's complaints of pain; that the activities Dr. Poonai noted Plaintiff could perform would be "further reduced" by his pain; and that Plaintiff's pain was present "even when" he was not "exceeding the activities described." Dr. Poonai opined that Plaintiff's pain was frequently debilitating. Dr. Poonai did not list any objective medical, clinical or laboratory findings that supported Plaintiff's claim of pain (R. 322).

On August 12, 2007, Tracy L. Cosner-Shepherd, M.S., completed an Adult Mental Profile of Plaintiff. Her general observations were that Plaintiff had braces on both wrists, he was driven to the appointment by his wife, he was cooperative, his psychomotor behavior was within normal limits, he did not have difficulty ambulating, and he did not use an ambulatory aid. Plaintiff's chief complaints were: he had no income; he had a herniated disc in his back, peripheral artery disease (PAD), a "heart valve [that did not] work," carpal tunnel, skin cancer (R. 325).

Plaintiff listed his symptoms as follows: would "rather stay by himself"; did not "like being around a lot of people, so he tend[ed] to stay home"; slept "a lot"; experienced "some" depression during the past eighteen months; would become aggravated and irritable; had low energy, increased weight; had outbursts of anger; had "some anxiety and . . . worr[ied] a lot" (R. 326). Plaintiff reported he smoked one package of cigarettes per day and medicated with Vytorin, Endocet, Lexapro, and Avandia. Plaintiff stated he was "most likely" dependent on pain medications, which he said he need[ed] to function in order to manage his chronic pain. Plaintiff stated he drank alcohol occasionally and "might drink about twice a month, having a couple beers at a time" (R. 326).

Plaintiff graduated from high school; he repeated the first and third grades. He reported he had "some learning problems and received specialized educational services." Plaintiff denied

difficulty getting along with coworkers or supervisors. He had a "fair relationship with family." He had been married for eighteen years, was still married, and had a fifteen-year-old child (R. 327).

Plaintiff's mental status examination revealed the following: cooperative attitude/behavior; good eye contact; appropriate responses; a bit reserved; relevant speech; oriented times four; neutral-to-pleasant mood; restricted-to-broad affect; normal thought process; organized stream of thought; no delusions, obsessive-compulsive behaviors, or phobias; no illusions or hallucinations; fair-to-average insight; mildly deficient judgment; suicidal ideations, but no plan or intent; no homicidal ideations; normal immediate memory, "markedly deficient" recent memory; normal remote memory; mildly deficient concentration; normal psychomotor behavior (R. 328).

Plaintiff's Verbal IQ was 70; Performance IQ was 85; Full Scale IQ was 75 (R. 328). Plaintiff was found to have a fourth grade reading level, a third grade spelling level, and a fifth grade arithmetic level. Ms. Cosner-Shepherd's objective findings were for: mild depressive symptoms, history of academic difficulties with mental limitations, history of legal problems, impaired memory, impaired concentration skills. Ms. Cosner-Shepherd's diagnoses were as follows: Axis I – depressive disorder, NOS, pain disorder associated with both psychological factors and a general medical condition, disorder of written expression; Axis II – borderline intellectual functioning, provisional; Axis III – herniated disks, PAD, problems with heart valve, carpal tunnel syndrome, skin cancer, and high cholesterol. Ms. Cosner-Shepherd noted her diagnostic rationale for her diagnosis of depressive disorder "was based on the claimant's subjective reports of depression" (R. 329). Plaintiff's prognosis as "fair" (R. 330).

Plaintiff reported his daily activities as follows: awoke at 4:00 a.m.; visited the doctor "a lot"; watched "a lot of television"; took long naps. He wife tied his shoes; he took care of the rest of his

personal hygiene. He cooked in the microwave; helped cook for the family "some"; cleaned the house "once in a while"; shopped for groceries with his wife once or twice monthly; did not drive "much"; did not walk; had no hobbies; belonged to no clubs or organizations; did not attend church regularly, but did on "special occasions and holidays"; did not "see family much"; and did not socialize with neighbors or friends (R. 330).

Plaintiff's concentration was mildly deficient. His persistence was within normal limits. His pace was mildly slow; his immediate memory was within normal limits; his recent memory was markedly deficient. Plaintiff was found to be competent to manage his finances (R. 330).

Administrative Hearing

On May 8, 2007, ALJ Mills conducted an administrative hearing. Plaintiff stated he weighted 175 pounds and that his fifteen pound weight gain was caused by depression. Plaintiff testified he drove "once in awhile" (R. 344). Plaintiff stated he could not "push on [the] break and the clutch at the same time (R. 345). Plaintiff stated he was "illiterate" and could read "little words" (R. 346). Plaintiff stated he had been evaluated for a permanent rating for worker's compensation; he received a "lump sum" of compensation in 1996 (R. 348).

Plaintiff testified his past work was that of salesman and driver for an oil company, a bulk account salesman, a "foreman pusher for a home improvement company," a delivery person for a home food supply company, a roofer, and a security guard (R. 350-52).

Plaintiff testified he had surgery on L5, S1 in 1990, but that his current "problems" were located at L4, L5 (R. 354). Plaintiff stated he had mild carpal tunnel syndrome in both wrists and a heart condition as diagnosed by Dr. Haywood. Plaintiff testified he took Percocet, four times daily, and morphine, once per day, to treat his pain, which is located in his lower back and radiates

down his right leg (R. 355). Plaintiff stated that, at one time, he medicated with Tramadol, opioids, morphine and Oxycontin "all at once." Plaintiff stated he received these medications from a pain management physician, whom he visits monthly (R. 356). Plaintiff testified he was being treated by Dr. Poonai for depression with Lexapro; he had not been evaluated by either a psychologist or psychiatrist (R. 356-57). Percocet and morphine caused Plaintiff to experience "lack of memory" and be "tired." Plaintiff testified he also took Vytorin for cholesterol and Tylenol (R. 357).

Plaintiff stated his leg pain was caused by peripheral artery disease, which was "hardening of the arteries" and "blood clots on both sides of [his] groin" (R. 358). Plaintiff stated the surgery he underwent to remove a blood clot in 2004 relieved his symptoms (R. 358-59). Plaintiff described his back pain as "constant pressure that sits in about the center of [his] back, lower back" Plaintiff listed his pain at "seven" at the hearing (R. 359).

Plaintiff stated he could "probably" walk one-hundred yards; could stand for fifteen minutes at one time; could not bend at the waist a "whole lot"; and "doubt[ed]" if he could squat (R. 360-61). Plaintiff testified he could make a fist and/or hold a fork/spoon with both hands; he had sensation in his hands (R. 362). Plaintiff could "comfortably" lift a gallon of milk and sit for twenty minutes. Plaintiff testified he was forgetful. Plaintiff stated he sometimes watched television and could understand what he watched (R. 363). Plaintiff had a computer, but did not use it to connect to the internet; he would rather be alone than in a crowd; he had a "problem with strangers"; he had shortness of breath; and he smoked a package of cigarettes per day (R. 364-65). Plaintiff testified he had no "problems" with the lesions that appeared on his head; they were not cancerous; and he wore a hat to protect himself (R. 366).

Plaintiff testified he slept for seven hours per night and could dress and bathe himself.

Plaintiff stated he prepared light meals, did a "little bit of grilling," or he "order[ed] [food] out a lot" (R. 367). Plaintiff described his typical day as rising at 4:30 a.m., preparing and drinking coffee, going down stairs to complete his personal hygiene, sitting in a recliner if he does not have to go to a doctor's appointment, and watching television (R. 368). Plaintiff stated he did not help his son prepare for school and did not participate in any Boy Scout functions with him. Plaintiff stated he did laundry "once in awhile" (R.369). Plaintiff participated in no hobbies or sports. He could no longer ride a bike, wrestle with his "little boy," have "intercourse with [his] lovely wife," or mow the lawn. Plaintiff testified he had not had a fishing license in three or four years and had last hunted in 2005 (R.371). Plaintiff stated he did not belong to any clubs, organizations, or churches (R. 372).

When questioned by counsel, Plaintiff stated Dr. Santiago had been his doctor for four years and prescribed morphine and Percocet. Plaintiff testified that his insurance company would not pay for spinal stimulation treatments (R. 363). Plaintiff testified that Dr. Ashker directed Plaintiff to undergo a surgical consultation at WVU and that he was "waiting on a date" for that consultation. Plaintiff stated that he was instructed to wear the braces for his carpal tunnel and that "the next step [would] be surgery." Plaintiff stated he had weakness in his hands (R. 374).

The ALJ asked the V.E. what work a person who could "stand and walk less than two hours, sit less than two hours. Frequently lift and carry 10 pounds, occasionally 20 pounds. Likely to miss work about twice a month" and take unscheduled breaks. The V.E. responded there was be no work that person could perform (R. 378). The ALJ asked the V.E. the following hypothetical question:

> . . . [A]ssume that the claimant is limited to sedentary work – or light work with a need to change positions throughout the work day and a sit/stand option, never climb any ladders, ropes or scaffolds, only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. Now with respect to the environmentals avoid concentrated exposure to temperature extremes, full body vibration, the hazards of

moving plant machinery and unprotected heights. My question is, would there be jobs in the national or regional economy such an individual could perform? (R. 379).

The V.E. responded such an individual could work as a mail clerk and garment sorter (R. 380).

The ALJ asked if there were jobs for an individual if exertional level were sedentary with the "other posturals and environmentals that I've previously described would be applicable." The V.E. stated the jobs of addresser stuffer and a charge account clerk were available (R. 380).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Mills made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since September 1, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*).

3. The claimant has the following severe impairments: lumbar spine problems with chronic low back pain and degenerative disc disease; mild carpal tunnel syndrome; keratosis of the scalp; depression disorder; pain disorder; disorder of written expression; borderline intellectual functioning; and a history of substance use disorder based on abuse of prescription pain medication (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls (20 CFR 404.1567 and 416.967). In addition, the claimant has the following exertional and non-exertional limitations: the claimant can stand/walk for no more than two hours out of an eight-hour day;

the claimant can sit for no more than six hours out of an eight-hour day; he must have a sit/stand option' [sic] he can do no work that requires him to climb ladders, ropes, or scaffolds; he can do no more than occasional climbing of ramps or stairs; he can do no work that requires more than occasional balancing, stooping, kneeling [sic] crouching or crawling; he must avoid working in areas of exposure to hazards, in areas of temperature extremes, or in areas of vibration; and he can do no more than unskilled work.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on February 2, 1965 and was 39 years old, which is defined as a "younger individual" within the meaning of the regulations, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2004 through the date of this decision (20 CFR 404.1520(g)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The

Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends the following:

1.    The ALJ erred when he failed to support his credibility determination with substantial evidence.

2.    The ALJ erred when he failed to give proper weight to Mr. Ryan's treating physicians' opinions.

The Commissioner asserts the following:

1.    The ALJ correctly determined that Plaintiff overstated the limiting effects of his symptoms.

2.    The ALJ properly gave no significant weight to Drs. Santiago's and Macht's opinions of disability.

## C. CONTENTIONS

### Credibility

Plaintiff contends the ALJ erred when he failed to support his credibility determination with substantial evidence. Specifically, Plaintiff asserts the ALJ made "very broad and vague conclusions" about Plaintiff's credibility, and the ALJ "utterly failed to actually discuss the seven factors as required" in 20 C.F.R. §404.1529. Defendant contends the ALJ correctly determined that Plaintiff overstated the limiting effects of his symptoms.

20 C.F.R. §404.1529(c) reads as follows:

> (c) *Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work*—

>> (3) *Consideration of other evidence.* Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will

consider include:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).
>
> . . .

Social Security Regulation 96-7p mandates the following:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> > 1. The individual's daily activities;
> >
> > . . .
> >
> > 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

The ALJ, in his decision, made the following finding:

> Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors

below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1. The claimant's daily activities;

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. Any measure other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

The undersigned finds that the claimant is not entirely credible with regard to his allegations of pain, limitations, and overall disability. The claimant indicated that his daily activities include light household cleaning, and not only caring for himself but his son (Exhibits 3E and 37F). If the claimant were truly disabled, or limited, to the degree alleged, he likely could not perform the level of activities that he described. Also, the claimant has alleged disability because of his back problems and history of coronary artery disease but has a history of smoking cigarettes. After consider the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are only fair at best (R. 25-26).

It is evident that the ALJ did not comply with 20 CFR 404.1529(c) in that he did not satisfactorily analyze those seven factors in his determination of Plaintiff's credibility. The ALJ did refer to Plaintiff's activities of daily living in his analysis, but he did not evaluate Plaintiff's activities based on the evidence contained in the record. The ALJ failed to analyze or discuss the "location,

duration, frequency, and intensity of the claimant's pain or other symptoms." The record is ripe with statements Plaintiff made to physicians, physical therapists, a psychologist and the ALJ at the administrative hearing as to his symptoms and limitations; however, the ALJ did not evaluate those statements. For example, Plaintiff reported his pain levels to Dr. Santiago on numerous visits, but the ALJ did not consider this evidence in his credibility determination (R. 179, 180, 181, 182, 183, 186, 187, 278, 280, 281,182, 285, 187). The ALJ did not address the "factors that precipitate[d] and aggravate[d]" the symptoms of which Plaintiff complained relative to the evidence. For example, Plaintiff stated that weather caused his back to hurt (R. 131-32, 173, 277, 279). Even though the ALJ's RFC limited Plaintiff's exposure to extreme temperatures, the ALJ did not evaluate the factor as required by the regulation. The ALJ did not consider the type, dose, effectiveness and/or side effects of the medication Plaintiff took to alleviate his symptoms in making his credibility determination. For example, the record contains statements Plaintiff made to his pain-management physician as to the effectiveness of the medication, that he often asked for refills of Percocet in advance of their due dates, and he had no negative side effects to his medication, but the ALJ failed to evaluate any of these factors (R. 179, 180-83, 269, 276-77, 280-83, 285 286-88). Plaintiff treated his alleged symptoms caused by mild carpal tunnel syndrome by wearing braces on both hands/wrists; the ALJ did not consider this factor (R. 374). Plaintiff participated in physical therapy for his alleged low back pain (22). The ALJ did note this in his decision, but he did not analyze it in his determination of Plaintiff's credibility. The factors noted above are in the record as are numerous other factors which the ALJ could have analyzed to support his finding as to Plaintiff's credibility. Additionally, the Commissioner asserts in his brief that the ALJ's finding as to Plaintiff's credibility is correct because Plaintiff's statements at the administrative hearing about his

weight gain were inconsistent with the medical evidence of record and Plaintiff demonstrated he could sit for longer than twenty minutes by remaining seated during the one-hour long administrative hearing (Defendant's brief at p. 9). The ALJ, however, failed to discuss these two factors.

It is the responsibility of the ALJ to identify, consider and analyze this evidence in his decision. In this case, the ALJ failed to do that adequately. For the reasons stated above, the ALJ's determination as to Plaintiff's credibility is not supported by substantial evidence.

## **Treating Physician**

Plaintiff contends the ALJ erred when he failed to give appropriate weight to Dr. Santiago's opinion that Plaintiff could sit for about two hours in an eight-hour day, could stand/walk for less than two hours in an eight-hour workday, could frequently lift ten pounds, and could occasionally lift twenty pounds and Dr. Macht's opinion that Plaintiff "had difficulty with prolonged sitting, walking, standing and driving. . . . [and] he had an 80% permanent partial impairment of his back" (Plaintiff's brief at p. 10). Defendant contends the ALJ properly gave no significant weight to Drs. Santiago's and Macht's opinions of disability.

The ALJ found the following:

The undersigned accords less weight to the opinions of the claimant's physician, Dr. Santiago, particularly at Exhibit 21F. In Exhibit 21F, Dr. Santiago opines, somewhat inconsistently that the claimant can lift/carry into the light exertional level, despite the claimant's allegations of disabling back pain and carpal tunnel syndrome. Dr. Santiago also opines that the claimant cannot sit for more than two hours out of an eight-hour day, but this opinion is not substantially supported by his own findings (see Exhibit 15F), or. . . the findings elsewhere in the medical evidence. Rather Dr. Santiago noted on February 11, 2004, that the claimant was stable (Exhibit 15F/14), and on April 26, 2005, that the claimant's activities of daily living were mostly sedentary (Exhibit 15F/1). Because the opinion is not well-supported (sic) by the objective medical evidence, the undersigned accords it less weight (R. 26-27).

The undersigned also accords less weight to the findings at Exhibits 3F, 4F, 5F and

34

13F that the claimant has a "permanent partial impairment" of his low back. An opinion of that nature, regarding one of ultimate disability, is dispositive to the issue *sub judice*, and is therefore reserved exclusively to the Commissioner. The undersigned therefore cannot accord the opinion any special significant or (sic) weight for the purposes of determining disability (R. 27).

20 C.F.R. §404.1527 reads, in part, as follows:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship* . Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination* . Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal

picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Plaintiff argues that the ALJ considered Dr. Santiago's February 11, 2004, opinion that Plaintiff was "'stable'" in assigning weight to his opinion and that the ALJ was "cherry picking a single ambiguous term of art" in supporting his assignment of weight to the opinions of Dr. Santiago. The undersigned finds the ALJ complied with the Regulation in assigning weight to the opinion of Dr. Santiago by evaluating Dr. Santiago's opinion thoroughly and showing it was not supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the evidence of record. Additionally, the ALJ noted the nature and extent of Dr. Santiago's treatment relationship was a "history of chronic opioid therapy" with Plaintiff and correctly found that Dr. Santiago's opinion as to Plaintiff's limitations was "not substantially supported in his own findings (see Exhibit 15F) . . . " (R. 22, 26-27). The relevant evidence in that exhibit spans October, 2004, to April, 2005, and is inconsistent with the limitations assigned to Plaintiff by Dr. Santiago. Dr. Santiago found Plaintiff had no side effects from his medication; Plaintiff was attempting to

become employed at a job that did not require "heavy" lifting; Plaintiff grocery shopped, drove a car, vacuumed, was a "handyman"; his activities were "mainly sedentary"; Plaintiff's increased pain was "weather related"; Plaintiff was able to "be more functional & more comfortable" with an increase in his dosage of Percocet; and Plaintiff's dosage of five Percocet per day was "not holding his pain" (R. 179-85). Dr. Santiago "counseled [Plaintiff] on pacing himself & not creating a cycle of increased activity & increased meds" (R. 184). Additionally, the ALJ noted, in his decision that Dr. Santiago had not indicated "that the claimant reported significant limitations or pain, or had limitations which would significantly limit his ability to do work-related physical activities" and that Dr. Santiago had diagnosed Plaintiff with "some mild sensory deficit in a right S1 distribution and . . . pain from the right L4-5 facet joint and the right L5-S1 facet joint" (R. 22).

Furthermore, Plaintiff contends that if the ALJ "cannot ascertain the basis of the opinion (as to the weight he assigns to the opinion of the treating physician) from the case record," the ALJ "should have recontacted (Dr. Santiago) in accordance with 20 CFR §404.1512(e)" (R. 22, 26-27) (Plaintiff's brief at p. 11). 20 C.F.R. §404.1512(e) reads, as follows:

> (e) *Recontacting medical sources.* When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. . . .

> (1) We will first recontact your treating physician . . . to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. . . .

Additionally, S.S.R. 96-5p, holds, in part, the following:

> . . . [A]djudicators must always carefully consider medical source opinions about any

issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

The evidence of record provided by Dr. Santiago and considered and analyzed by the ALJ was not inadequate for him to render an opinion as to the weight to be assigned Dr. Santiago's opinions. As noted above, the ALJ discussed Exhibit 15F, and that evidence contained inconsistencies in Plaintiff's treating physician's opinions. The ALJ identified and analyzed those inconsistencies; therefore, his findings were well supported and in conformance with 20 C.F.R. §404.1527.

Dr. Santiago's opinion that Plaintiff could sit for about two hours in an eight-hour workday, could stand/walk for less than two hours in an eight-hour workday, could frequently lift ten pounds, and could occasionally lift twenty pounds and Dr. Macht's opinion that Plaintiff had "difficulty with prolonged sitting, walking, standing and driving" and had an eighty percent permanent partial impairment of his back were also not supported by the medically acceptable clinical and laboratory diagnostic techniques and other substantial evidence of record. In his decision, the ALJ noted that Plaintiff was found to have "'no electrophysical evidence of lumbar radiculopathy'" on December 13, 2004; Plaintiff was found to have "facet joint pain generators underlying muscles spasms in his back" on January 13, 2005; a Doppler scan of Plaintiff's lower extremities showed no "significant occlusive disease for the right and left iliac, femoral, or popliteal arteries" on February 17, 2005; Plaintiff's September 7, 2004, MRI of his lumbar spine was unchanged from the August 30, 2002, MRI, which showed "degenerative and post operative changes at L4-5 and L5-S1"; and a March 28, 2007, MRI showed "scar tissue with only mild disc protrusion, but no disc herniation and nothing to warrant surgical intervention" (R. 22). The ALJ noted that Dr. Ashker opined, on March 20,

2007, that Plaintiff could "get up and walk on toes and heel, and get up from a squat position without difficulty, and he had little limitation in his lower back range of motion" (R. 23). The ALJ made a finding that the "objective medical evidence does not show that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence of inflamed arachnoidal tissue resulting in the need for a change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate effectively" (R. 23).

As to Dr. Macht's opinion about Plaintiff's limitations, it is imprecise. He notes Plaintiff could not "sit, walk, stand or drive as much as before" (R. 133, 173). This finding is not supported by the evidence of record due to its not containing specific restrictions or limitations as to Plaintiff's ability to perform these activities. The ALJ's assignment of "less weight" is, therefore, supported by the evidence. Additionally, Dr. Macht's opinion that Plaintiff had an eighty percent permanent partial disability was, as the Commissioner argues, a worker's compensation disability determination and is not controlling in a social security case. 20 C.F.R. §404.1504 holds that a determination as to disability must be "based on social security law" (Defendant's brief at p. 13). The ALJ is not bound by this disability determination and was correct in assigning this opinion "less weight."

Finally, only the Commissioner can make a finding that an individual is disabled. 20 C.F.R. § 494,1527(e)(1) holds:

> *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

The ALJ did not err in the weight he assigned to the opinions of Drs. Santiago and Macht and his opinion is supported by substantial evidence.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find substantial evidence does not support the Commissioner's decision to deny Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED, in part,** and Plaintiff's Motion for Summary Judgment be **GRANTED, in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this day of *14 January,* 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE